# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Honorable James B. Clark III |
| | : | |
| v. | : | Mag. No. 16-3155 (JBC) |
| | : | |
| ANDREW KNIGHTS, | : | **CRIMINAL COMPLAINT** |
|     a/k/a "War Bugatti," | : | |
|     a/k/a "Flamez," | : | |
|     a/k/a "Trinity," | : | |
| ALEXANDER WEEKES, | : | |
|     a/k/a "Treezy," | : | |
|     a/k/a "Trix," and | : | |
| NASHID P. MATEEN-BOLDEN, | : | |
|     a/k/a "Patrick Bolden," | : | |
|     a/k/a "P Gudda" | : | |

I, Peter O'Shaughnessy, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent with the United States Postal Service, Office of the Inspector General, and that this complaint is based on the following facts:

SEE ATTACHMENT B

Continued on the attached pages and made a part hereof.

_____
Peter O'Shaughnessy
Special Agent
United States Postal Service
Office of the Inspector General

Sworn to before me and subscribed in my presence,
October 3, 2016, at Newark, New Jersey

_____
HONORABLE JAMES B. CLARK III
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

From in or about February 2015 through in or about August 2015, in Cape May County, in the District of New Jersey, and elsewhere, defendants

ANDREW KNIGHTS,
a/k/a "War Bugatti,"
a/k/a "Flamez,"
a/k/a "Trinity,"
ALEXANDER WEEKES,
a/k/a "Treezy,"
a/k/a "Trix," and
NASHID P. MATEEN-BOLDEN,
a/k/a "Patrick Bolden,"
a/k/a "P Gudda"

did knowingly and intentionally conspire with each other and others to commit an offense against the United States, that is, to embezzle, steal, and convert to their own use and the use of others, and without authority convert and dispose of blank money order forms provided by and under the authority of the United States Postal Service and thereafter did acts to effect the object of the conspiracy, contrary to Title 18, United States Code, Section 500, in violation of Title 18, United States Code, Section 371.

**ATTACHMENT B**

1. I, Peter O'Shaughnessy, am a Special Agent with the United States Postal Service, Office of the Inspector General. I am fully familiar with the facts set forth herein based on my own participation in this investigation, interviews and briefings with other law enforcement officers, and interviews and briefings with witnesses. I also have reviewed other evidence, including video footage, toll records, bank records, and historical cell-site data. Because this complaint is being submitted for the limited purpose of establishing probable cause, I have not set forth herein each and every fact that I know concerning this investigation. All times set forth herein are approximate and refer to Eastern Time. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. Unless otherwise indicated, statements attributable to individuals are set forth in substance and in part.

2. At various times relevant to this complaint:

   a. Defendant Andrew Knights, a/k/a "War Bugatti," a/k/a "Flamez," a/k/a "Trinity" ("KNIGHTS") resided in Astoria, New York. KNIGHTS had a Facebook account under the name "Bugatti War."

   b. Defendant Nashid P. Mateen-Bolden, a/k/a "Patrick Bolden," a/k/a "P Gudda" ("BOLDEN") resided in Howard Beach, New York. BOLDEN had a Facebook account under the name "Real P Gudda."

   c. Defendant Alexander Weekes, a/k/a "Treezy," a/k/a "Trix" ("WEEKES") resided in Brooklyn, New York. WEEKES had a Facebook account under the name "Tmm Treezy."

   d. Jonel Normil ("Normil) was employed as a letter carrier with the United States Postal Service ("USPS"). Normil was employed by the post office in Cape May Court House, New Jersey.

   e. There was a post office located in Stone Harbor, New Jersey (the "Stone Harbor Post Office"). The Stone Harbor Post Office did not employ any letter carriers. Rather, Normil and other letter carriers assigned to the Cape May Court House post office picked up and dropped off mail, on a daily basis, at the Stone Harbor Post Office.

3. On May 3, 2016, in the District of New Jersey, Normil pleaded guilty to conspiring to embezzle, steal, and convert to his use own use and the use of others blank USPS money order forms, contrary to 18 U.S.C. § 500, in violation of 18 U.S.C. § 371. See Crim. No. 16-219 (MCA). As set forth in the Information, Normil utilized the access afforded him as a USPS letter carrier to steal blank USPS money orders from the Stone Harbor Post Office. On May 28, 2015, for

example, Normil was captured on video stealing approximately 15 blank USPS money orders from the Stone Harbor Post Office.

4. According to an analysis of USPS records, approximately 279 blank postal money orders were stolen from the Stone Harbor Post Office between approximately February 2015 and May 2015. Between approximately March 2015 and July 2015, at least approximately 173 of these stolen money orders were deposited into bank accounts or cashed at post offices, resulting in a loss of approximately $167,000.

5. The investigation has revealed probable cause to believe that WEEKES, KNIGHTS, BOLDEN, and others profited by converting many of the blank postal money orders illegally obtained by Normil from the Stone Harbor Post Office into counterfeit money orders, usually in the amounts of $900 or $1,000, depositing those counterfeit money orders into straw bank accounts, and withdrawing the proceeds from the straw bank accounts before the banks realized that the deposited money orders were counterfeit.

6. Between February 1, 2015 and March 13, 2015, there were 101 text messages and 12 phone calls between a cellular phone used by Normil and a cellular phone used by Weekes (the "Weekes Facility"). On August 5, 2015, law enforcement approached and interviewed Normil concerning this counterfeit money order scheme. Normil admitted to having illegally obtained blank postal money orders and indicated that he passed along the money orders to an individual who was "not local," likely referring to WEEKES. Additionally, law enforcement has identified an individual who received counterfeit money orders from WEEKES that had been illegally obtained by Normil from the Stone Harbor Post Office. This individual identified WEEKES as a source for counterfeit money orders and stated that, in the Summer of 2015, WEEKES advised this individual that WEEKES' source for counterfeit money orders had gotten into trouble. WEEKES likely was referring to Normil's arrest in August 2015.

7. Below are a few examples linking WEEKES, KNIGHTS, and BOLDEN to fraudulent transactions involving straw bank accounts and counterfeit money orders illegally obtained by Normil from the Stone Harbor Post Office.

BOLDEN's Account at Citibank

8. On March 16, 2015, according to Citibank records, BOLDEN opened an account at Citibank, using his New York State driver's license as identification. One week later, on March 23, 2015, at approximately 2:02 p.m., in Newton, Massachusetts, $5,000 in counterfeit money orders were deposited into BOLDEN's Citibank account. Later that day, at approximately 3:24 p.m., an additional $4,000 in counterfeit money orders were deposited into Bolden's Citibank account. And, finally, that same day, $5,000 in illegally-obtained cash proceeds from the prior deposits of counterfeit money orders were withdrawn

from BOLDEN's Citibank account in two separate transactions. The serial numbers on the counterfeit money orders confirmed that the money orders originated at the Stone Harbor Post Office in Stone Harbor, New Jersey, and were obtained by Normil. Historical cell-site data placed a cellular phone used by WEEKES (the "Weekes Facility") and a cellular phone used by KNIGHTS (the "Knights Facility") in the vicinity of these Citibank locations during the fraudulent transactions described above.

9. On March 24, 2015, there were 11 text messages and 6 phone calls between the Weekes Facility and a cellular phone used by BOLDEN (the "Bolden Facility"). Additionally, between March 23, 2015 and March 26, 2015, there were 11 calls from the Bolden Facility to Citibank, likely to communicate with the bank regarding the fraudulent scheme.

10. Between August 21, 2015 and approximately December 2015, KNIGHTS was detained at the Corrigan-Radkowski Correctional Center in Connecticut for charges arising out of an incident unrelated to the money order scheme. While KNIGHTS was detained awaiting trial on these charges, KNIGHTS made a number of recorded jail phone calls.[1] On November 23, 2015, KNIGHTS made a recorded phone call to an individual who is identified herein as "D.J." During this phone call, KNIGHTS asked D.J. to reach out to BOLDEN and referred to Bolden as "one of my runners." It is likely that by "runners," KNIGHTS was indicating that BOLDEN was one of the individuals whose role in the scheme was to deposit counterfeit money orders and to withdraw cash from the bank accounts into which the counterfeit money orders had been deposited. Referring to BOLDEN, KNIGHTS said, "He [BOLDEN] fuck with me. He fuck with Treezy [WEEKES]. He met Treezy a couple times. He went on a roll with me and Treezy to Boston." It is likely that when KNIGHTS indicated that BOLDEN had gone "on a roll" to Boston, he was indicating that BOLDEN had traveled with KNIGHTS and WEEKES to Boston to deposit and cash out counterfeit money orders.

Individual 1's Account at Bank of America

11. According to Bank of America records, there were two deposits of $4,000 each, consisting of counterfeit money orders, on April 20, 2015 and April 21, 2015, in Astoria, New York, into the account of Individual 1. The serial numbers on the counterfeit money orders confirmed that the money orders originated at the Stone Harbor Post Office in Stone Harbor, New Jersey, and were illegally obtained by Normil. On the deposit slips for each of the transactions, a telephone number was listed for Individual 1 (the "Individual 1 Facility"). On April 21, 2015, there were two separate withdrawals of approximately $3,300 and $640, comprising a portion of the illegally-obtained proceeds, from the earlier

---

[1] At the beginning of each recorded phone call, the parties on the phone are advised that "this call is subject to recording and monitoring."

deposits of counterfeit money orders. KNIGHTS was captured in a bank ATM surveillance photo conducting the $640 cash withdrawal.

12. An analysis of toll records confirms that there were approximately 72 calls and text messages exchanged between the Individual 1 Facility and the Knights Facility, between April 16, 2015 and April 25, 2015. Additionally, an analysis of toll records indicates that between April 20, 2015 and April 21, 2015, there were 88 phone calls and text messages between the Knights Facility and the Weekes Facility. Finally, historical cell-site data placed the Weekes Facility and the Knights Facility in the vicinity of these Bank of America locations during each of the $4,000 deposits described above.

Individual 2's Account at Bank of America

13. According to Individual 2, in April 2015, BOLDEN obtained from Individual 2 an ATM card for a bank account at Bank of America that belonged to Individual 2. On April 24, 2015, and again on April 27, 2015, according to Bank of America records, $4,000 in counterfeit money orders (for a total of $8,000) were deposited into Individual 2's account, at Bank of America locations in New York. The serial numbers on the counterfeit money orders confirmed that the money orders originated at the Stone Harbor Post Office in Stone Harbor, New Jersey, and were illegally obtained by Normil.

14. According to Individual 2, at BOLDEN's direction, Individual 2 withdrew from Individual 2's bank account $3,200 in illegally-obtained cash proceeds on April 27, 2015 and $3,200 in illegally-obtained cash proceeds on April 28, 2015, and Individual 2 handed the proceeds to BOLDEN. Additionally, Individual 2 identified KNIGHTS as the individual who withdrew the remaining $800 from Individual 2's account, on two separate occasions, for a total of $1,600. Individual 2 drove BOLDEN and KNIGHTS to Bank of America branch locations, in Jamaica, New York, and Howard Beach, New York, for each of the cash withdrawals.

15. Law enforcement also obtained text messages exchanged between a cellular phone used by Individual 2 and the Bolden Facility. In these text messages, Individual 2 advised BOLDEN that Individual 2 had been contacted by the bank regarding the prior deposits of counterfeit money orders. BOLDEN advised Individual 2 to lie to the bank, to "say no you don't have a card," and "you lost it remember and you thought they would send a new one because they usually kut [sic] it off." BOLDEN further stated, via text message, "Yo what ever u do just say u had nun to do wit this" and "Don't give them no names or nun."

Individual 3's Account at Bank of America

16. According to Individual 3, KNIGHTS informed Individual 3 that Individual 3 could earn approximately $800 by allowing KNIGHTS to use

6

Individual 3's bank account. KNIGHTS indicated that KNIGHTS or individuals acting at KNIGHTS' direction would deposit money orders into Individual 3's bank account and that these individuals would then withdraw the illegally-obtained monies from Individual 3's bank account. KNIGHTS would then pay Individual 3 a portion of the illegally-obtained monies. According to Individual 3, KNIGHTS indicated that he was engaged in this scheme with several other individuals.

17. Individual 3 gave KNIGHTS access to Individual 3's bank account, and on July 15, 2015, in New York, New York, $4,000 in counterfeit money orders were deposited into Individual 3's bank account. The serial numbers on the counterfeit money orders confirmed that the money orders originated at the Stone Harbor Post Office in Stone Harbor, New Jersey, and were illegally obtained by Normil. At KNIGHTS' direction, Individual 3 withdrew approximately $3,500 of the illegally-obtained proceeds from an ATM in New York. According to Individual 3, KNIGHTS informed Individual 3 that another person would come to Individual 3's residence to pick up the proceeds, and Individual 3 identified BOLDEN as the individual who came to retrieve the $3,500 from Individual 3 in Richmond Hills, New York.

### Individual 4's Account at Bank of America

18. Individual 4 confirmed that Individual 4 worked as a taxi driver in the Summer of 2015 and routinely picked up a group of men from an apartment complex in Astoria, New York. KNIGHTS resided in this apartment complex. Individual 4 drove these men to various locations, including Bank of America branches, TD Bank branches, and post offices. The men agreed to pay Individual 4 with money orders, deposited into Individual 4's account. Individual 4 confirmed that two $4,000 deposits of counterfeit money orders were made into Individual 4's account, on June 23, 2015 and June 25, 2015. The serial numbers on the counterfeit money orders confirmed that the money orders originated at the Stone Harbor Post Office in Stone Harbor, New Jersey, and were illegally obtained by Normil. Individual 4 subsequently withdrew $3,200 of the illegally-obtained proceeds on June 24, 2015 and $1,700 of the illegally-obtained proceeds on June 26, 2015. Individual 4 retained approximately $2,000 of the proceeds, and Individual 4 passed along the remainder of the proceeds to one of the men.

19. According to toll records, between March 20, 2015 and May 31, 2015, there were approximately 859 phone calls and text messages between a phone number associated with Individual 4 and the Knights Facility. Additionally, an individual familiar with KNIGHTS' handwriting confirmed that the handwriting on the counterfeit money orders deposited into Individual 4's account belonged to KNIGHTS. Accordingly, it is likely that KNIGHTS was the individual who received the proceeds from Individual 4.

20. On June 17, 2016, law enforcement executed a search warrant at an apartment in Astoria, New York, at which KNIGHTS resided while engaging in this counterfeit money order scheme. Among other things, law enforcement recovered a cellular telephone used by KNIGHTS (the "Second Knights Facility"). The Second Knights Facility contained text messages between KNIGHTS and an individual identified in the contact list on the phone as "Trix New," likely referring to WEEKES. On June 24, 2015, at approximately 9:31 a.m., KNIGHTS received a text message from WEEKES that read: "Let me know when you grab the guss." In the context of bank activity and later text messages, "the guss" likely referred to the cash proceeds from the deposits of counterfeit money orders into Individual 4's account. On June 25, 2015, KNIGHTS received a text message from WEEKES that read: "You got 3300 and you only gave me 1450 bro its suppose [sic] to be 1650," likely meaning that WEEKES had expected to receive an additional $200 of the profits from the monies withdrawn from Individual 4's account.

### Individual 5's Account at Bank of America

21. According to Bank of America records, Individual 5 opened a bank account with Bank of America on April 24, 2015. On May 26, 2015, $4,000 in counterfeit money orders were deposited into Individual 5's account. The serial numbers on the counterfeit money orders confirmed that the money orders originated at the Stone Harbor Post Office in Stone Harbor, New Jersey, and were illegally obtained by Normil. An individual familiar with KNIGHTS' handwriting confirmed that the handwriting on the counterfeit money orders deposited into Individual 5's account belonged to KNIGHTS. Bank surveillance video captured an individual who has been identified and who is referred to herein as "N.C." making the fraudulent deposits into Individual 5's account. Toll records confirm that there were 2 phone calls between a phone used by N.C. and the Knights Facility on May 26, 2015. Additionally, historical cell-site data placed the Knights Facility in the vicinity of this Bank of America location during the $4,000 deposit described above.

22. On May 27, 2015, at approximately 9:35 a.m., bank surveillance video captured Individual 5 withdrawing $2,000 in illegally-obtained proceeds, from the prior deposits of counterfeit money orders, at a Bank of America location in New York, New York. According to toll records, between May 26, 2015 and May 28, 2015, there were approximately 373 phone calls and text messages between a phone used by Individual 5 (the "Individual 5 Facility") and the Knights Facility. More specifically, on May 27, 2015, between 9:45 a.m. and 9:58 a.m., immediately after the $2,000 cash withdrawal, there were 12 text messages exchanged between the Knights Facility and the Individual 5 Facility. Also, on May 27, 2015, according to toll records, there were 6 phone calls and text messages between the Knights Facility and the Weekes Facility and 3 phone calls from the Knights Facility to Bank of America, likely to communicate in furtherance of the money order scheme.

<u>Individual 6's Account at Bank of America</u>

23. According to Bank of America records, on May 14, 2015, in Forest Hills, New York, $4,000 in counterfeit money orders were deposited into the account of Individual 6. The serial numbers on the counterfeit money orders confirmed that the money orders originated at the Stone Harbor Post Office in Stone Harbor, New Jersey, and were illegally obtained by Normil. Bank surveillance captured BOLDEN making the $4,000 fraudulent deposit. Historical cell-site data placed the Knights Facility in the vicinity of the Bank of America location during this $4,000 deposit.

24. On May 15, 2015, $3,800 in illegally-obtained proceeds, from the prior deposit of counterfeit money orders, were withdrawn from Individual 6's account, in New York, in two separate transactions, in Howard Beach, New York.

25. According to toll records, there were approximately 91 phone calls and text messages between the Weekes Facility and the Knights Facility between May 14, 2015 and May 15, 2015, the time period during which the fraudulent activity on Individual 6's account occurred.